UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

LARRY M. HOAK,

                Petitioner,

    v.

STATE OF IDAHO,

                Respondent.

Case No. 1:09-cv-00389-EJL

**MEMORANDUM DECISION AND ORDER**

On September 13, 2012, the Court conditionally granted Respondent's Motion for Summary Dismissal on procedural default grounds, but determined that it would withhold entering final judgment until it had an opportunity to determine whether cause and prejudice existed for any of Petitioner's claims in the Amended Petition for Writ of Habeas Corpus (Dkt. 36) that might permit the Court to hear the merits of the claims, under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), or *Maples v. Thomas*, 132 S.Ct. 912 (2012). (Dkt. 62, pp. 10-12.)

Respondent was ordered to supplement the record with any additional filings from the state court post-conviction matter. That has been done. (Dkt. 63, 64.) Petitioner was permitted to file a supplemental brief to establish why his post-conviction counsel's alleged ineffectiveness or abandonment should excuse the default of any of his claims.

MEMORANDUM DECISION AND ORDER - 1

Petitioner has filed a Motion to Proceed with Habeas Petition, two Supplements, and a Reply; Respondent has filed a Response. (Dkt. 65, 67, 68, 73, 79.) Even though Petitioner was expressly ordered not to file anything other than a supplemental brief and a reply, he filed eight additional motions. (Dkt. 66, 70, 71, 72, 74, 81, 84 and 86.)

Having reviewed the record in this matter, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1. For the reasons set forth below, the conditional granting of Respondent's Motion for Summary Dismissal will be made final, and the Amended Petition for Writ of Habeas Corpus will be dismissed. In addition, the Court will not issue a certificate of appealability in this case.

## PROCEDURAL BACKGROUND

After a jury trial in state court, Petitioner was convicted of felony stalking. (State's Lodging A-2, pp. 216-17.) He was also convicted of being a persistent violator, and he received a sentence of ten years to life. (*Id*. at 218.)

On appeal, Petitioner's counsel argued that the trial court had erred in admitting evidence of Petitioner's prior bad acts under Idaho Rule of Evidence 404(b) ("I.R.E. 404(b)"). (State's Lodging B-1.) Petitioner also submitted his own *pro se* supplemental brief, in which he alleged primarily that the trial judge should have disqualified herself because she was biased against him. (State's Lodging B-2.) The Idaho Court of Appeals rejected the I.R.E. 404(b) argument, and it did not address Petitioner's supplemental brief. (State's Lodging B-5.) Petitioner's counsel filed a petition for review in the Idaho Supreme Court, reasserting the same evidentiary claim that he had raised in the Court of

**MEMORANDUM DECISION AND ORDER - 2**

Appeals, but the Idaho Supreme Court declined to review the case. (State's Lodging B-8.)

While the direct appeal was still pending, Petitioner filed an application for post-conviction relief in the state district court. (State's Lodging C-1.) The trial court stayed post-conviction proceedings pending completion of the direct appeal. (*Id.*)

Before the Idaho Supreme Court issued its remittitur on direct appeal and while the post-conviction matter was still pending in the state district court, Petitioner filed a federal Petition for Writ of Habeas Corpus. (Dkt. 2.) As a result of the pending state matters, this case was stayed. (Dkt. 17.) Petitioner's state post-conviction petition was dismissed in late 2010, and Petitioner did not appeal the state district court's decision to the Idaho Supreme Court. (State's Lodging C-1.)

The stay of the federal case was lifted, and Petitioner filed an Amended Petition on July 7, 2011, including the following claims: (1) his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by misconduct of the prosecutor, Gabriel Haws; (2) the trial court violated Petitioner's Sixth Amendment right to call witnesses on his behalf and conspired with the prosecutor and Petitioner's defense counsel, Mike Lojek; (3) Petitioner was deprived of his Sixth Amendment right to the effective assistance of trial counsel; and, liberally construed, (4) the sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment. (Dkt. 36, pp. 2-3.)

The Court conditionally granted Respondent's Motion for Summary Dismissal, and Petitioner now has an opportunity to show cause and prejudice to excuse the default of his claims under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), or *Maples v. Thomas*, 132

**MEMORANDUM DECISION AND ORDER - 3**

S.Ct. 912 (2012).

## PRELIMINARY MOTIONS

### 1.    Petitioner's Motion to Recuse (Dkt. 74)

Petitioner requests that this Court recuse itself "because of prejudice or conflict of interest." (Dkt. 74, p. 1.) The basis for the request is that Petitioner believes he already has proven his innocence, and this Court has rejected that argument.

Petitioner has not shown that 28 U.S.C. § 455[1] or any case interpreting that section

---

[1] Section 455 provides:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(I) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

**MEMORANDUM DECISION AND ORDER - 4**

applies to the facts of this case. Disqualification is not required where the Petitioner challenges the Court's impartiality based upon its rulings. Such alleged errors are "the basis for appeal, not recusal." *In re Focus Media, Inc*., 378 F.3d 916, 930 (9th Cir. 2004). There has been no showing that the "court's substantive rulings were products of deep-seated favoritism or antagonism that made fair judgment impossible." *Id*. (internal citation and punctuation omitted). Petitioner has pointed to no facts supporting an argument of bias or prejudice, but, instead, he simply disagrees with the rulings of this Court. Accordingly, the Motion to Recuse will be denied.

## 2.     Petitioner's Motion re: Amended Complaint and Appointment of Counsel (Dkt. 66)

Petitioner asks the Court to take into consideration the National Legal Aid and Defender Association's published evaluation of criminal defense services conducted from 2007 to 2010. He alleges that the study shows that the State has been violating the civil rights of persons accused of crimes for the last three decades because of the poorly-funded public defender system. (Dkt. 66, p. 1; Dkt. 38.) The report discusses the high workloads of public defenders in Idaho, and how they have little time and resources to devote to defendants' cases. However, the Court cannot base its determinations in this case on generalized statements of averages in criminal defense cases; it must rely on those

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

**MEMORANDUM DECISION AND ORDER - 5**

facts in the record.

In addition, Petitioner must be able to tie the procedural default of his claims to this report, which he has not done. As the Court discusses in detail herein below, Petitioner has not shown that any prejudice to his case resulted from the alleged deficiencies of his counsel. Nevertheless, this document will remain part of the record to support Petitioner's claim that his trial and post-conviction counsel performed ineffectively.

In his Motion, Petitioner does provide some factual allegations regarding why he believes his initial post-conviction counsel, Theresa Martin, was ineffective, but that does not aid the subject of his Motion, which is to request permission to amend his Petition for Writ of Habeas Corpus or to have counsel appointed for him. He alleges that, when they first met at the prison, Ms. Martin told him that he had no claims that would warrant relief, and that it was a waste of time to pursue post-conviction relief. Petitioner then complained about Ms. Martin's representation to Judge Copsey, and Judge Copsey held a hearing on the motion to disqualify Ms. Martin. After the hearing, Judge Copsey ordered Ms. Martin to finish the case. Petitioner claims that he tried to contact Ms. Martin repeatedly at various telephone numbers, but Ms. Martin would not communicate with him. (Dkt. 66, pp. 4-5.) Petitioner then makes an argument under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012).

The grounds Petitioner has alleged in his Motion do not support granting Petitioner an additional opportunity to amend his Petition for Writ of Habeas Corpus. Rather, his

**MEMORANDUM DECISION AND ORDER - 6**

argument goes to whether the procedural default of his claims can be excused. The Court will consider his argument for that purpose, herein below.

To the extent that Petitioner wishes to amend his Amended Petition of July 7, 2011 (Dkt. 36) to include new claims, he has not (1) clearly stated any new claims; (2) shown that any new claims have been raised and exhausted in the Idaho state court system; (3) stated why he did not raise the claims in his Amended Petition after clear advance warning from the Court on June 13, 2011 (Dkt. 32), that all claims must be included in the Amended Petition; or (4) shown that his claim–that has been tendered after the expiration of AEDPA's statute of limitations–relates back to the initial filing date. To do so, it must be "tied to a common core of operative facts" in the original pleading. *Mayle v. Felix*, 545 U.S. 644, 664, 650 (2005) (an amended habeas corpus petition "does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.").

To the extent Petitioner is seeking appointment of counsel in this case, the Court concludes that appointment is not warranted. Petitioner is a prolific filer and has adequately protected his interests in this matter. The *Martinez v. Ryan* argument is not so complex that it is beyond Petitioner's ability to present facts supporting his position. A thorough search of the record shows that Petitioner's claims are meritless, and, therefore, appointment of counsel would not aid in the decisionmaking process. Therefore, this Motion will be denied.

**MEMORANDUM DECISION AND ORDER - 7**

3.   **Petitioner's Motion: Civil Procedure 10(c) (Dkt. 71), Motion: Civil Procedure 10(c) - Jury Trial Demand (Dkt. 72), and Rule 10 Motion to Attach New Evidence (Dkt. 81)**

Plaintiff has filed several motions requesting that Federal Rule of Civil Procedure 10(c) be applied to his Petition and his exhibits submitted in support thereof. Rule 10(c) provides:

> A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.

As the Rule states, a "written instrument" is considered a part of a pleading. A "written instrument" is a document essential to the elements of the cause of action in the Complaint, such as a copy of a contract or negotiable instrument at issue. *See Rose v. Bartle*, 871 F.2d 331, 339 n. 3 (3d Cir.1989) (internal quotation omitted) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327) (holding that an attached affidavit was not a "written instrument" under Rule 10(c) and thus was not properly considered part of the pleadings).

Rule 10(c) has no application to the Habeas Corpus Petition filed in this case. Perhaps if Petitioner's crime were forgery, passing bad checks, or some other act centering on a written instrument *and* the written instruments were part of the state court record, the Rule might have some applicability.

In habeas corpus, a petitioner may submit exhibits in the context of procedural default, but he may not submit exhibits that have not been considered by the state courts

**MEMORANDUM DECISION AND ORDER - 8**

in support of the merits of his claim.[2] Here, this case is at the procedural default stage, and so the Court can consider any relevant items that Petitioner wishes to submit for the limited purposes of showing cause and prejudice or actual innocence. The Court will permit Petitioner to submit as evidence his article from the Boise Weekly, entitled: "Justice for All? Fifty years after landmark case, Idaho still struggles to provide adequate indigent defense," to the extent that he can show its relevance to the cause and prejudice issues at hand; however, the article will not be considered incorporated into the Petition under Rule 10(c).

Petitioner asks that he be permitted to attach a demand for jury trial to his Petition. (Dkt. 71 & 72.) Jury trials are not permitted in federal habeas corpus cases. Accordingly, because this request is unsupported by law, it will be denied.

Petitioner also seeks appointment of counsel. (Dkt. 72.) As noted above, this request will be denied.

## 4. Petitioner's Motion to Amend or Correct Petition Under Rule 60(b) and Reply (Dkts. 84, 86)

Rule 60(b) applies when a judgment has been entered. No judgment has been entered in this case; hence, the Motion (Dkt. 84) will be denied as premature. Petitioner's

---

[2] The merits of the claims in a federal habeas corpus petition generally are decided on the record that was before the state court. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011). Only in limited circumstances may the state court record be supplemented in federal court, such as: (1) when a state court did not decide a claim on the merits, and the claim is properly before the federal court; (2) when the state court factual determination was unreasonable; (3) when a petitioner wishes to show cause and prejudice in a procedural default setting; or (4) when a petitioner is trying to show actual innocence to overcome a procedural default or statute of limitations issue.

**MEMORANDUM DECISION AND ORDER - 9**

"Motion: Response to Docket 85" (Dkt. 86), though designated a motion, is a reply in support of the Rule 60(b) motion, and will be denied.

**5.      Respondent's Motion for Extension of Time (Dkt. 70)**

Respondent has requested an extension of time in which to file a *Martinez v. Ryan* brief. Good cause appearing from the Motion and accompanying Affidavit (Dkt. 70, 71), the extension of time will be granted. Respondent's brief (Dkt. 73) is considered timely.

## CAUSE AND PREJUDICE STANDARD OF LAW

**1.      Where Ineffective Assistance of Post-Conviction Counsel or Lack of Counsel is the Alleged Cause of the Default**

### A.      *Historical View of the Standard of Law*

If a petitioner's claim is procedurally defaulted, a federal district court cannot hear the merits of the claim unless a petitioner meets one of two exceptions: a showing of adequate legal cause for the default and prejudice arising from the default, *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991), or a showing of actual innocence, which means that a miscarriage of justice will occur if the claim is not heard in federal court. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show "prejudice," a petitioner bears "the burden of showing not merely that the errors [in his proceeding] constituted a possibility of prejudice, but that they worked

to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982). This "cause and actual prejudice" test, more often termed simply "cause and prejudice," was adopted and clarified as a grounds for excusing procedural default in 1991 in *Coleman v. Thompson.* 501 U.S. at 745.

Several cases have clarified whether and how to apply the cause and prejudice test in various factual circumstances. For example, if a petitioner points to an instance of ineffective assistance of counsel during direct appeal that prevented the petitioner from properly exhausting his claims, he cannot rely on that instance unless he has first exhausted that particular ineffective assistance of counsel claim. If a petitioner has not exhausted any ineffective assistance of counsel claim, then he cannot rely on such a claim for "cause" in a "cause and prejudice" argument. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (ineffective assistance of counsel cannot serve as cause for the default of another claim unless the ineffective assistance of counsel claim is not itself procedurally defaulted or cause and prejudice for the default of the ineffective assistance claim can be shown).

A petitioner does not have a federal constitutional right to effective assistance of counsel during state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule is that any errors of his counsel during the post-conviction action cannot serve as a basis for cause to excuse Petitioner's procedural default of his claims. *See Coleman*, 501 U.S. at 752.

**MEMORANDUM DECISION AND ORDER - 11**

### B.   *Advent of Martinez v. Ryan*

The holding of *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), established a limited exception to the *Coleman* rule–that inadequate assistance of post-conviction review (PCR) counsel or lack of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 1315.[3]

The *Martinez* exception applies only to the ineffectiveness of PCR counsel in the initial post-conviction review proceeding. It "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial." 132 S.Ct. at 1320. Rather, *Martinez*, is singularly concerned that, if ineffective assistance of trial counsel (IATC) claims were not brought in the collateral proceeding which provided the first occasion to raise such claims, the effect was that the claims could not be brought *at all. See* 132 S.Ct. at 1316. Therefore, a petitioner may not use as cause attorney error that occurred in "appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." 132 S.Ct. at 3120.

In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the United States Supreme Court described the *Martinez* test as consisting of four requirements or prongs:

---

[3] *Martinez* applies only if the ineffective assistance of counsel claim is exhausted (no further avenue of state court relief is available) and procedurally defaulted (an adequate and independent state procedural ground for the default exists). If the new claim is unexhausted and not procedurally defaulted, then the petitioner may be able to return to state court to assert the claim under the stay-and-abey procedure. *See Rhines v. Weber*, 544 U.S. 269 (2005).

**MEMORANDUM DECISION AND ORDER - 12**

We consequently read *Coleman* as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

133 S.Ct. at 1918 (citing *Martinez*, 132 S.Ct. at 1318–19, 1320–21).

(1)     Whether the Ineffective Assistance of Trial Counsel Claim is Substantial

While Ninth Circuit case law on how to apply *Martinez* to procedurally-defaulted IATC claims is still developing, especially as to the differing and overlapping standards of prejudice mentioned but not expounded upon in *Martinez, see Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012),[4] and *Detrich v. Ryan*, – F.3d –, 2013 WL 4712729 (9th Cir. 2013) (en banc) (plurality opinion),[5] it is entirely clear from *Martinez, Trevino,*

---

[4] In *Sexton v. Cozner,* 679 F.3d 1150 (9th Cir. 2012), a panel of the United States Court of Appeals for the Ninth Circuit addressed *Martinez* and held: "a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial counsel is substantial, and whether there is prejudice." *Id.* at 1159. The *Sexton* language mirrors the vague *Martinez* language, without elaboration, and its approach to prejudice is consistent with other precedent. *Cf. Maples v. Thomas*, 132 S.Ct. 912, 917 (2012) (a PCR attorney's complete abandonment of the client in a post-conviction proceeding may serve as cause, but the petitioner still must show "actual prejudice as a result of the alleged violation of federal law." *Id.* at 914 (quoting *Coleman v. Thompson*, 501 U.S. 722 (1991)); *accord, Stokley v. Ryan*, 705 F.3d 401, 403 (9th Cir. 2012).

[5] In the *Detrich* case, a plurality of judges concluded: "A prisoner need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez* requirement." 2013 WL 4712729 at *6. That set of judges reasoned:

If a prisoner who had PCR counsel were required to show prejudice, in the ordinary *Strickland* sense, resulting from his PCR counsel's deficient performance in

**MEMORANDUM DECISION AND ORDER - 13**

*Sexton*, and *Detrich* that, as a necessary first prong for the *Martinez* exception to apply, a petitioner must bring forward some facts demonstrating that his ineffective assistance of trial counsel claim is substantial.

The United States Supreme Court has defined "substantial" as a claim that "has some merit." *Martinez*, 132 S.Ct. at 1318 (comparing the standard for certificates of appealability from *Miller–El v. Cockrell*, 537 U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 1319.

Determining whether a claim is substantial requires a federal district court to examine both prongs of an IATC claim under *Strickland v. Washington*, 466 U.S. 668 (1984)–deficient performance and prejudice. As to deficient performance, *Strickland* emphasizes that there is a strong presumption that a trial attorney performed within the wide range of professional competence; the attorney's performance will be deemed deficient only if it fell below an objective standard of reasonableness measured under prevailing professional norms. *Strickland*, 466 U.S. at 689-90.

---

order to satisfy the second *Martinez* requirement, the prisoner would have to show, as a condition for excusing his procedural default of a claim, that he would succeed on the merits of that same claim. But if a prisoner were required to show that the defaulted trial-counsel IAC claims fully satisfied *Strickland* in order to satisfy the second *Martinez* requirement, this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland* claims were "substantial"—that is, that they merely had "some merit." *See Martinez*, 132 S.Ct. at 1318–19.

*Id.*

**MEMORANDUM DECISION AND ORDER - 14**

For example, the *Strickland* Court outlined how to assess deficient performance in a failure-to-investigate claim:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. *Strickland* cautions courts to remember that "[t]here are countless ways to provide effective assistance in any given case." *Id*. at 689.

Prejudice under *Strickland* means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id*.

These standards from *Strickland* for determining deficient performance and prejudice, are, of course, the standards for an eventual review of the merits of the IATC claim. The first *Martinez* prong is not the same as a merits review, but, as the *Martinez* Court explained, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *See Martinez*, 132 S.Ct. at 1318-19 (comparing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). Therefore, a court may conclude that a claim is substantial when a petitioner has shown that "resolution" of

**MEMORANDUM DECISION AND ORDER - 15**

the merits of the *Strickland* claim would be "debatable among jurists of reason," or that the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal citation and punctuation omitted). Thus, the first prong of *Martinez* requires the district court to *review* but not *determine* whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to *determine* only whether resolution of the merits of the claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them.

(2)     Whether PCR Counsel was Ineffective

A second necessary prong of *Martinez* is a showing that petitioner had no counsel on initial PCR review, or that PCR counsel was "ineffective under the standards of *Strickland*." 132 S.Ct. at 1318; *see Trevino*, 133 S.Ct. at 1918. "Ineffectiveness" is a term defined by *Strickland* as deficient performance and a reasonable probability of prejudice caused by the deficient performance. 466 U.S. at 694, 700.

Not just any error or omission of counsel will be deemed "deficient performance" that will satisfy *Martinez;* if the PCR "attorney in the initial-review collateral proceeding did not perform below constitutional standards," the PCR attorney's performance does not constitute "cause." 132 S.Ct. at 1319. The *Strickland* standards for analyzing deficient performance set forth above apply with equal force to PCR counsel.[6]

_____

[6] However, it is yet unclear whether the *Martinez* deficient performance test is like that of applying *Strickland* to direct appeal counsel, another instance where counsel is charged with raising and pursuing claims arising from a criminal trial. That is, on direct appeal, "effective legal assistance" does

**MEMORANDUM DECISION AND ORDER - 16**

While there is some variance among jurists[7] whether an additional showing of prejudice must be demonstrated beyond the first prong's "substantiality" determination to allow a petitioner with a procedurally-defaulted IATC claim to enter the "cause and prejudice" gateway to a merits analysis, for purposes of the analysis of the IATC claims in this case, that variance can be reconciled as several different paths leading to the same result.[8] In other words, a showing of a *Strickland* "reasonable probability of prejudice" at

---

not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id.*, 463 U.S. at 754. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52.

[7] The fact that *Detrich v. Ryan* is an en banc plurality opinion adds to the difficulties of determining application of the standards of law. The "narrowest grounds" approach of the United States Supreme Court is that a plurality case holding is "that position taken by those Members who concurred in the judgments on the narrowest grounds." *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion discussing another plurality opinion); *Marks v. United States*, 430 U.S. 188, 193 (1977)). The narrowest ground for the decision in the *Detrich v. Ryan* case is that the petitioner's motion to remand the case to the district court should be granted, allowing the district court to determine whether petitioner's procedural default may be excused under *Martinez v. Ryan. See Detrich*, 2013 WL 4712729 at *23 (Watford, C.J., concurring in the judgment). However, in more recent years the United States Supreme Court has acknowledged the difficulty of application of the *Marks* approach, such as in *Grutter v. Bollinger*, 539 U.S. 306 (2003), where it observed: "It does not seem useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it." *Id.* at 325 (internal citation and punctuation omitted).The Ninth Circuit has recently used the *Marks* test and has also stated that a plurality decision is "persuasive authority, though not a binding precedent." *Lair v. Bullock*, 697 F.3d 1200, 1202 (9th Cir. 2012). Addressing the issue of potentially conflicting case law in *Rodriguez v. AT & T Mobility Services, LLC*, the Ninth Circuit instructed district courts to focus on the reasoning and analysis in support of a holding," not simply the holding, and to determine whether "the cases are clearly irreconcilable." 2013 WL 4516757 (9th Cir. 2013) (internal citations and punctuation omitted).

[8] Assessing prejudice for IATC claims as to PCR counsel can be analogized to assessing prejudice as to direct appeal counsel. That is, the prejudice caused by the deficient performance of either PCR counsel or direct appeal counsel arises or is derived from prejudice that occurred at trial. As to a cause and prejudice analysis involving direct appeal counsel, the United States Court of Appeals for the Eighth Circuit explained that the "prejudice we evaluate within this framework is not prejudice emanating from the services of appellate counsel, but rather, that prejudice arising from the acts or omissions of plea [trial] counsel"; in other words, a petitioner must show that the "ineffective assistance of *trial* counsel

**MEMORANDUM DECISION AND ORDER - 17**

the level of the second *Martinez* prong would satisfy the *Coleman* requirement of a

showing of "actual prejudice" in the cause and prejudice test (theoretically opening the

door for a procedurally-defaulted claim to reach a merits analysis),[9] which also would

satisfy a showing of prejudice in a *Strickland* merits analysis (that theoretically takes

place when the procedural default door is opened).[10] A showing of prejudice alone under

---

worked to his actual and substantial disadvantage, and infected his entire trial with constitutional error."
*Taylor v. Bowersox*, 329 F.3d 963, 972 (8th Cir. 2003) (emphasis in original). This comports with
*Detrich's* instruction that district courts should review only (1) substantiality and (2) deficient
performance of PCR counsel. *See* 2013 WL 4712729 at *6.

[9] In her concurring opinion in *Detrich v. Ryan*, 2013 WL 4712729 at *21-23, Judge Nguyen
reminded:

> Although the *Coleman* and *Strickland* prejudice standards are articulated differently,
> precedents from this court and the Supreme Court suggest that they are one and the same.
> *See, e.g., Robinson v. Ignacio*, 360 F.3d 1044, 1054 (9th Cir. 2004) ("When conducting a
> 'prejudice' analysis in the context of [overcoming a procedural default], this court applies
> the standard outlined in [*Strickland*]."); *see also Roe v. Flores–Ortega*, 528 U.S. 470,
> 484, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("[W]e follow the pattern established in
> *Strickland* ... requiring a showing of actual prejudice ( i.e., that, but for counsel's errors,
> the defendant might have prevailed)....").

*Id.* at *23 (Nguyen, J., concurring).

[10] In *Detrich*, instead of requiring a showing of prejudice in the second prong of *Martinez*, or in
the "actual prejudice" portion of the *Coleman* cause and prejudice test, the plurality of judges instructed
the federal district court to proceed directly to a *Strickland* merits determination on remand:

> We remand to the district court under *Martinez* to determine, in the first instance,
> whether there is "cause" to excuse state PCR counsel's procedural default. If the district
> court finds that there was "cause," it should then address on the merits the substantial
> trial-counsel IAC claims that it previously held procedurally defaulted under
> pre-*Martinez* law. As to these claims, the two-step cause and prejudice test of *Strickland*
> applies.

2013 WL 4712729 at *10.

**MEMORANDUM DECISION AND ORDER - 18**

any of these formulations, of course, is not enough to *prevail* on the merits,[11] unless the answer to whether there is prejudice arising from trial counsel's performance is coextensive with the answer to whether trial counsel performed deficiently.[12]

> ### (3)   Whether the PCR Proceeding Was or Would Have Been the Initial Review of the IATC Claim

The third prong of *Martinez* is that the post-conviction review proceeding be the first opportunity the petitioner had to present the IATC claim. In other words, the post-conviction proceeding must have been "the equivalent of a prisoner's direct appeal" for the IATC claim. *Martinez*, 132 S.Ct. at 1317. *Martinez* does not apply if the petitioner should have brought the claim on direct appeal (see the fourth prong, discussed below).

> ### (4)   Whether State Law Requires that the IATC Claim Be Raised

The fourth prong of *Martinez* is that state law must *require* that IATC claims be raised in an initial collateral proceeding. 132 S.Ct. at 1320. Questions arose whether the *Martinez* exception could be applied where the initial collateral proceeding was a state's preferred, but not mandatory, avenue for raising IATC claims. In *Trevino v. Thaler*, the Supreme Court clarified that, where "a State's procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have

---

[11] The *Martinez* Court explained: "A finding of cause [ineffective assistance of PCR counsel] and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." 132 S.Ct. at 1320 (parenthetical added).

[12] In *Roe v. Flores-Ortega*, the Court explained: "We recognize that the prejudice inquiry we have described is not wholly dissimilar from the inquiry used to determine whether counsel performed deficiently in the first place. . . . But, while the performance and prejudice prongs may overlap, they are not in all cases coextensive." 528 U.S. at 485-86.

**MEMORANDUM DECISION AND ORDER - 19**

a meaningful opportunity to raise an ineffective-assistance-of-trial-counsel claim on

direct appeal," the exception recognized in *Martinez* applies. 133 S.Ct. at 1921.

In Idaho, the post-conviction setting is the "preferred forum for bringing claims of

ineffective assistance of counsel," although in limited instances such claims may be

brought on direct appeal "on purported errors that arose during the trial, as shown on the

record" (as opposed to matters arising outside the record). *Matthews v. State*, 839 P.2d

1215, 1220 (Idaho 1992).

**2.     Where Abandonment of PCR Counsel is the Alleged Cause of the Procedural
         Default**

In *Maples v. Thomas*, 132 S.Ct. 912, 917 (2012), the United States Supreme Court

determined that an attorney's complete abandonment of the client in a post-conviction

proceeding, which leaves the petitioner unrepresented at a critical time, may serve as

cause. In *Maples*, the lawyers ceased acting as Maples's attorneys without telling him;

they did not serve as his agents in any meaningful sense, and left him in a situation where

he lacked the assistance of any authorized attorney, so "that, in reality, he had been

reduced to pro se status." *Id.* at 927.

Even if a petitioner can show that the lawyer abandoned the client under *Maples* to

establish "cause" for his procedural default, he still must show "actual prejudice as a

result of the alleged violation of federal law." *Maples*, 132 S.Ct. at 914 (quoting *Coleman

v. Thompson*, 501 U.S. 722 (1991); *Stokley v. Ryan*, 705 F.3d 401, 403 (9th Cir. 2012).

That is, a petitioner "must establish 'not merely that the [alleged error] ... created a

**MEMORANDUM DECISION AND ORDER - 20**

possibility of prejudice, but that [it] worked to his actual and substantial disadvantage,' infecting the entire proceeding with constitutional error." *Id*. (citing *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (citation omitted) (emphasis in original), and *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (prejudice requires a showing that the error has a "substantial and injurious effect" on the sentence)).

## REVIEW OF TRIAL PROCEEDINGS FOR
## CAUSE AND PREJUDICE PURPOSES

Petitioner was charged with felony stalking of his former girlfriend, Kathy Hendricks,[13] who was about 52 years old at the time of the incidents alleged. (State's Lodging A-3, p. 119.) State District Court Judge Cheryl C. Copsey presided over Petitioner's trial. The State was required to prove, beyond a reasonable doubt, that, "on or between May 2006 and November 2006, in the state of Idaho, Larry Matthew Hoak knowingly and maliciously engaged in a course of conduct that seriously alarmed, annoyed or harassed the victim, Katherine Hendricks, and the course of conduct [was] such that would cause a reasonable person substantial emotional distress." (*Id*., pp. 527-28.) Evidence as to events that occurred before May 2006 or after November 2006 was admitted only for the limited purpose of aiding the jury in determining the intent and state of mind of Petitioner and the state of mind of Kathy Hendricks. (*Id*., pp. 529-30.)

The State introduced a vast array of evidence to support its case. The State introduced photographs of the victim's injuries from an alleged domestic violence

---

[13] This spelling is used in the trial transcript; a typed letter from Ms. Hendricks uses the spelling "Kathi"; and Petitioner uses "Kathie."

**MEMORANDUM DECISION AND ORDER - 21**

episode, audiotaped telephone conversations of or messages from Petitioner, telephone records related to Petitioner, and letters from Petitioner. (State's Lodging A-5.) The State called as witnesses a detective, a bail bondsman, two friends of the victim, and the ex-wife of Petitioner's brother. The evidence showed that Petitioner made attempts to repeatedly contact the victim, either personally or through third parties. Some of the discussions in the calls and letters relayed Petitioner's seemingly obsessive love for the victim; other discussions included real or veiled threats to harm the victim.

Because of the large amount of evidence that was derived directly from Petitioner, including the calls and letters and a guilty plea to a previous misdemeanor battery charge against the same victim, it would have been very difficult for Petitioner to prevail in his case had no other evidence been presented by the prosecution. For example, one letter, addressed to "Shelly" or "Shelley" (one of several aliases Petitioner used for Kathy), stated:

> Do you realize what it's like to suffer. Look at your pain. It's constant. My pain is just like that.... Why can't you trust me. I will not abuse the phone or you. Okay? I feel you all of the time.... I know you still love me. We talked about this. Can you see how crazy I'm getting.
>
> Worry? I don't know why. Babe, please don't you know I can't figure this out. I can't figure out why you don't know it. Can't you just do what we talked about? I won't be here that long, Shelley. I talked to the bank. I got mad and I'm trying to deal with this. I can't stand it anymore. Shelley, I have to hear your voice. Please, I can't take it anymore.

(State's Exhibit A-3, pp. 237-38.)

The State presented additional testimonial evidence to bolster the telephone calls

**MEMORANDUM DECISION AND ORDER - 22**

and letters. The State relied heavily on the victim's testimony. Kathy Hendricks, 54 years old at the time of trial, testified of many instances of verbal and physical abuse at the hands of Petitioner, including an incident of Petitioner preventing her from leaving her home in January 2005, which resulted in him pushing her over a chair and her sustaining multiple bruises, and which further resulted in Petitioner being charged with and convicted of domestic battery. (State's Lodging A-3, pp. 128-137.) Kathy obtained a protective order after that incident, and testified that Petitioner continued to write her letters from the jail–as noted above, he simply addressed the letters to her under cover of other names, such as "Deb Anderson," "Shelly or Shelley Guthrie," and "Jean Kieto." (*Id.*, pp. 134-36.)

After Petitioner was released from jail in March 2005, Kathy gave him a second chance. She testified that, after that time, Petitioner forced her to have sex with him (*id.*, p. 139); punched her in the chest and side (fracturing her ribs) (*id.*, pp. 163-65); tried to strangle her (*id.*, pp. 164); and was physically violent with her on several occasions, including hitting, slapping, and pushing her around. (*Id.*, p. 168.)

Petitioner was arrested again after police officers saw Kathy's bruising, and Petitioner spent July 2005 to October 2005 in jail. (State's Lodging A-3, pp. 168-69.) Petitioner continued to contact Kathy by phone and letter during this time period, and Kathy accepted some of the contact, but did not write back to Petitioner. (*Id.*, pp. 170-72.)

Kathy testified that she continued to have contact with Petitioner because, "He wanted things done. He wanted stuff taken care of. There were definitely some calls that

regarded business and things that needed to be taken care of. So there was some necessary

reasons to have some contact." (State's Lodging A-3, p. 174.) She felt as though she

needed to slowly back off and move away from the situation, rather than end the

relationship immediately. (*Id*.) At that point she was fearful of him, because of some

specific threats:

> He talked about how if I turned him in to – at that time how if I
> turned him into the police again, he was going to have to hurt me the way
> that I've hurt him and he talked about professionally he was going to have
> to get someone professional to deal with me. I wouldn't know when it was
> going to happen. He was going to have me beat up another time.

(State's Lodging A-3, p. 175.) Kathy characterized the relationship with Petitioner as

being filled with "abuse, extreme jealously, major anger issues." (*Id*., p. 173.)

Kathy further testified that, when Petitioner was released in October 2005, a no-

contact order was in place, and the parties were permitted to have contact for the purposes

of business and financial reasons only. (State's Lodging A-3, p. 177.) They had some

instances of personal contact, including intimate contact, but had a very strained

relationship. Petitioner was moving to Oregon and wanted Kathy to go with him, and

Kathy did not want to go, which made Petitioner angry. (*Id*., pp. 190-92.)

Kathy testified that in December 2005, Petitioner called Kathy between 10 and 15

times and invited her over to his apartment; she finally agreed to meet him on a public

street. He convinced her to go to his apartment to pick up some of her things before he

moved out of town. When they arrived at his apartment, he pushed her around and

demanded that they go to her house in her car. Kathy agreed, and, when Petitioner

**MEMORANDUM DECISION AND ORDER - 24**

stopped to go into a 7-Eleven store, Kathy testified:

> He – right before he got out of the car, he got about two inches from my face and he told me that if I ever got him in trouble with the police again, that he would cut my head off and that was not a threat, that was a promise. And he said it didn't matter if he had ended up going to prison however long it took, that it was going to happen.

(State's Lodging A-3, p. 183.)

Kathy testified that, when Petitioner next got out of the car during the trip to her house, she hit the gas and took off. (State's Lodging A-3, pp. 179-185.) Petitioner was arrested on December 31, 2005; during that time he left numerous messages on Kathy's voicemail, going back and forth between messages of threats and anger over Kathy calling the police and messages to please come and get him. (*Id.*, pp. 185-87.)

Kathy further testified that, the week after Petitioner's arrest, she wrote some Bible verses in a greeting card and sent it to him. She initiated no other contact with him after that point. (State's Lodging A-3, p. 193.) She had her cell phone number disconnected and began using a new unpublished number. (*Id.*, p. 194.)

In May 2006 (the beginning time period relevant to the stalking charge), Petitioner began sending letters intended for Kathy to third parties, including Penny Stine, the ex-wife of Petitioner's brother. (State's Lodging A-3, pp. 196-239.) Several letters referenced a real life media-reported incident of a man who had cut off his wife's head in a domestic dispute. (*Id.*, pp. 219-20, 224.) The content of the letters ranged from accusing Kathy of having affairs with other men, threatening to turn her into the police for various acts (such as picking up Petitioner's prescription medication from the pharmacy), stating

**MEMORANDUM DECISION AND ORDER - 25**

that "I can't think of someone touching you," and expressing love for her. (*Id.*, pp. 196-239.)

During this time, Petitioner tried to contact Kathy multiple times by calling other people's phones, such as when Petitioner knew that Penny would be at a garage sale with Kathy. (State's Lodging A-3, pp. 217-18.) In one letter he wrote, "Do me a favor. I'm getting sick of Penny and keeping her in the middle might be trouble....I called your house in Nampa. The phone was still off." (*Id.*, p. 231.)

Petitioner also telephoned Shannon Brownai, a mutual acquaintance, to try to speak to Kathy. (State's Lodging A-3, pp. 287, 309-20.) Shannon worked as a paralegal at a law firm that represented Petitioner in 2005; after that, Shannon and Kathy became friends. Shannon also worked as a realtor and testified that Kathy asked her to list her house for sale because Kathy was trying to protect herself. (*Id.*, p. 317.) Shannon also recalled a conversation where Petitioner called her about his truck, because Shannon had taken over payments of Petitioner's truck for her son, but she said, "[T]hat's what he alleged to be calling about. But the portion of that conversation was so minimal and quickly switched over to the focus being Kathy." (*Id.*, pp. 315-16.)

Gavin Kowallis, who worked at Aladdin Bail Bonds in October 2006, testified that Larry asked him to call Kathy and try to get a hold of her; one time he was supposed to ask her something about a stolen car. (State's Lodging A-3, pp. 299-304.) Mr. Kowallis said the calls were not welcomed by Kathy, and he stopped making the calls for Petitioner when he learned there was a protective order in place. (*Id.*, p. 304.)

**MEMORANDUM DECISION AND ORDER - 26**

Detective Shelly Strolberg of the Ada County Sheriff's Office testified about various letters and phone calls she reviewed from Petitioner, all to or for Kathy. (State's Lodging A-3, pp. 366-391.) She testified that Petitioner dictated a letter to another inmate to be sent to Kathy. She also stated that the phone records showed that Petitioner's inmate ID number matched 16 calls made to Kathy's place of employment. (*Id.*) Another 24 calls from the jail were made to Kathy's office, but they could not be tracked specifically to Petitioner, although Detective Strolberg testified that Petitioner could have used another inmate's ID number to make the calls, or he could have solicited another inmate to make the calls. (*Id.*, p. 387.)

Detective Strolberg identified a recording of a telephone call from Petitioner in the jail to a man named "Don Cada"; the subject matter of the call was a discussion about Kathy Hendricks. (State's Lodging A-3, pp. 396-97.) The recording had been redacted based on a stipulation between counsel. (*Id.*) The redacted recording was played for the jury.[14] (*Id.*)

---

[14] An *unredacted* description of the telephone call between Petitioner and "Donny" is found attached to Petitioner's post-conviction petition, from which one can derive the substance of the call played for the jury:

> [Mr. Hoak] calls the man "Donny" later in the conversation while talking about what Mike's [a third party] "old lady" said and did. He tells "Donny" several times that he is not going to jail for something he didn't do. He goes on to explain that he had three strokes and during that time he phoned Kathy and left a message on her recorder and told her he was sick.

> He told "Donny" this story about the phone call and surrounding issues: "*you bitch, ... I didn't say bitch.... I said, Kathy, if I end up in prison–she was supposed to go to Portland with me, she said wait–well when I call her the next day she wouldn't answer her phone, she wouldn't answer her phone and the cops were coming to my house; my stuff was half packed and I'd had 3 strokes and I couldn't even drive I'd said: I'll cut*

When Petitioner took the stand, he testified that Kathy's bruises occurred as a result of accidents Kathy had. (State's Lodging A-3, p. 445.) Contrary to Shannon's testimony, Petitioner testified that Kathy was selling her house so that she could move to Oregon with him. (*Id.*, p. 457.)

Petitioner testified that he was trying to reach Kathy so that he could determine what happened to his personal property; he particularly did not want it to be sold at Penny's garage sale. (State's Lodging A-3, pp. 462-63.) Petitioner admitted on cross-examination that he called Penny Stine in August 2006 because he wanted Penny to talk to Kathy for him. (*Id.*, p. 513.)

Petitioner testified that he was trying to reach Shannon because Shannon had leased Petitioner's truck and stopped paying for it. (*Id.*, p. 464.) He admitted on cross-examination that he told Shannon he needed to hear from Kathy's mouth that Kathy was through with Petitioner. (*Id.*, p. 512-13.) He also admitted he asked Shannon to tell Kathy to give Kathy's number to Joan Lanning, a bail bondsman. (*Id.*, p. 513.)

Petitioner testified that he wrote several letters to Kathy because he "loved her with all of [his] heart." (*Id.*, p. 465.) Petitioner also admitted during cross-examination that he had pleaded guilty to domestic battery against Kathy in July of 2005 and had caused the marks on her arms, but, regardless, he was actually innocent of that crime.

---

*your head off if I go to prison on her recorder.*"

State's Lodging C-2, p. 190 (emphasis in original to indicate an actual quotation rather than a paraphrase.)

**MEMORANDUM DECISION AND ORDER - 28**

(State's Lodging A-3, pp. 488-89.)

The trial defense strategy of Petitioner's counsel, Mike Lojek, was twofold. First, he made efforts to narrow the time frame of the evidence that could be presented to the time frame provided in the charging Information, arguing that prior bad acts should not be admitted. This laid the groundwork for Petitioner's direct appeal. (State's Lodgings B-1 to B-5.)

The other part of Mr. Lojek's strategy was to challenge the evidence supporting the state of mind element of the cause of action. As Petitioner put it (when complaining of Mr. Lojek's representation of him before trial):

> He wants to put my life on one word, malicious. Okay. He wants to gamble with my life on just one word. Did he maliciously. And that's not going to happen. I want my witnesses. And I have a right to cross-examine them. I want them here. I want to defend myself.

(State's Lodging A-5, p. 56.)

Before trial, Petitioner complained to Judge Copsey that Mr. Lojek refused to subpoena the victim's mother to testify on Petitioner's behalf. Petitioner explained that, "her mother, you know, she's the one that started everything and I want that known to the jury, this is what I was dealing with when this all started and he doesn't want to do that. He doesn't want to defend me." (State's Lodging A-5, p. 56.) Petitioner explained that the relevance of the victim's mother's testimony was that, when the victim was a child (approximately 40 years earlier), the mother "conspired with – her husband to molest her daughter." (*Id*., p. 57.) The court then explained the necessity of relevancy again, and

**MEMORANDUM DECISION AND ORDER - 29**

said, "I don't see how that has anything to do with the allegations in this case. You

haven't explained to me why it's relevant to this case. So I can't see that Mr. Lojek is

doing something that he shouldn't do." (*Id.*)

Petitioner further explained that the victim's mother and other relatives had made

threats to him, but the court further explained that he could testify about the threats

without having the persons who allegedly made the threats present. (State's Lodging A-5,

p. 59.) The court further explained: "If, in fact, you did all of the things that the

prosecutor is talking about, the fact that the mom told you that [the victim] had been

molested [by the victim's father 40 years earlier] or if the mom liked you or didn't like

you or whatever, that really doesn't have anything to do with your own conduct." (*Id.*, pp.

60-61.)

At trial, Mr. Lojek had Petitioner testify about how Petitioner attempted to contact

Kathy for legitimate or benign reasons, such as discussing financial affairs, determining

what happened to his personal property, or because he genuinely loved her and was

concerned for her welfare; Petitioner testified that someone at Shannon Brownai's law

firm told him that Kathy was "into – on the internet prostituting to truck drivers and stuff,

like dating older people, you know, she's 52." (State's Lodging A-3, pp. 437-75, 465.)

In addition to Petitioner, Mr. Lojek called two witnesses, Joan Lanning and

Shawna Lance, employees of a bail bond company, who both testified that Petitioner took

steps to recall his instructions to third parties that they should deliver to the victim some

letters he earlier had sent to them that were intended for the victim. (State's Lodging A-3,

**MEMORANDUM DECISION AND ORDER - 30**

pp. 411-19.) Mr. Lojek did not cross-examine Gavin Kowallis or Shannon Brownai. He *did* cross examine Kathy Hendricks, Penny Stein, and Detective Shelly Stolberg.

At the conclusion of the jury trial, Petitioner was found guilty of stalking and of being a persistent violator.

## DISCUSSION

### 1.      Application of *Martinez v. Ryan*

The *Martinez* exception applies only to ineffective assistance of trial counsel (IATC) claims that are procedurally defaulted as a result of ineffective assistance of PCR counsel. Therefore, only Claim 3, that Petitioner was deprived of his Sixth Amendment right to the effective assistance of trial counsel, is potentially eligible for this exception. Petitioner alleges that his trial counsel failed to (1) call witnesses, (2) object to the lies that Kathy Hendricks told under oath, (3) cross-examine witnesses, (4) object to the presentence investigation report (PSI), and (5) object to two prison guards being on his jury. (Dkt. 36-1, p. 8.)

Some of these claims were raised by Petitioner in the initial post-conviction petition and were rejected on the merits by the state district court. These claims were later procedurally-defaulted, not because they were not raised in the initial post-conviction proceeding, but because Petitioner failed to appeal the merits decision of the state district court. Thus, the following IATC claims that were rejected on the merits are not eligible for the *Martinez* exception: trial counsel's failure to (1) call witnesses (State's Lodging C-29, p. 9), (2) object to the lies that Kathy Hendricks told under oath (*Id*., p. 8), and (3)

**MEMORANDUM DECISION AND ORDER - 31**

cross-examine witnesses (*Id.*) *See Detrich*, 2013 WL 4712729 at *7.

This leaves only the claims that trial counsel failed to (4) object to the presentence investigation report (PSI), and (5) object to two prison guards being on his jury. As to these two claims, Respondent argues that Petitioner has failed to show that they are substantial. (Dkt. 73.)

### A.    *Failure to Object to the Presentence Investigation Report (PSI)*

Petitioner alleges that Mr. Lojek was ineffective at sentencing for failing to advise Petitioner that he could refuse to participate in the court-ordered psychological evaluation on the basis of his Fifth Amendment right to be free from self-incrimination. On a similar issue, in *Estrada v. State*, 149 P.3d 833 (Idaho 2006), the Idaho Supreme Court held that a psycho*sexual* evaluation is a critical stage of a criminal prosecution such that the defendant has (1) a Sixth Amendment right to the advice of counsel about whether to undergo an evaluation and (2) a Fifth Amendment right to refuse to participate in the evaluation. *Id.* at 838–39.

On the issue of *psychological* examinations, in *State v. Hanson*, 271 P.3d 712 (Idaho 2012), the Idaho Supreme Court held that a defendant may waive the Fifth Amendment privilege against self-incrimination in order to submit to a psychological evaluation without waiving it with respect to participation in the PSI. The *Hanson* Court also held that the decision to order a psychological evaluation lies within the sentencing court's discretion; however, a psychological evaluation is mandatory when there is reason to believe the mental condition of the defendant will be a significant factor at sentencing,

**MEMORANDUM DECISION AND ORDER - 32**

relying on Idaho Code § 19–2522(1) and Idaho Criminal Rule 32(d).

The practical result of the holdings of these two cases is that the state district court *may* order a psychosexual examination and *must* order a psychological evaluation when mental health is at issue, but the defendant is free to plead the Fifth and decline participation. This does not mean, however, that the sentencing court would not conduct a presentence investigation (PSI) and have a PSI report prepared; rather, the PSI report would be based only on interviews with other people, Petitioner's criminal record, and other materials derived from sources other than Petitioner.

The Court concludes that this claim is not substantial, because Petitioner cannot show that reasonable jurists would find debatable the Court's conclusion that there is not a reasonable probability that Petitioner was prejudiced by his participation in the psychological evaluation such that the outcome of his sentencing hearing would have been different.

Although the sentencing court relied on the psychological report, it is clear from the record that Petitioner's extensive criminal record (including similar crimes) and the gravity of the charged crime caused the state district court to sentence Petitioner to life in prison for the protection of society. Judge Copsey noted that Petitioner had "wracked up a staggering number of victims," that this conviction was his eleventh known adult felony conviction, and that he also had 43 misdemeanor convictions. (State's Lodging C-29, pp. 3-4.

MEMORANDUM DECISION AND ORDER - 33

In denying Petitioner's Rule 35 motion, which was a request for leniency, the

sentencing court wrote:

> This Court agrees with the pre-sentence investigator – all that
> continues to change is the place, date and name of his victims. It is sad that
> she wrote this in 1996 when Hoak had been convicted of Aggravated
> Assault as a Persistent Violator and had he been incarcerated for a lengthy
> time at that time, many more victims would not have been created. Enough
> is enough. Society deserves protection. The Court found that in order to
> deter future such crimes by Hoak, this sentence was necessary. There is a
> need to deter Hoak from such behavior and protect society from Hoak's
> choices.
>
> The Court found that the magnitude of this crime outweighed Hoak's
> character and background. Therefore, the court found that this sentence
> would promote rehabilitation; there is a need for some punishment that fits
> the crime before real rehabilitation will be effective. Finally, the court finds
> that the crime itself simply deserves this punishment. It is a serious crime.
> The court finds that this sentence fulfills the objectives of protecting society
> and achieves deterrence, rehabilitation and retribution and therefore denies
> Hoak's Motion for Reconsideration.

(State's Lodging A-2, p. 287.)

Accordingly, even assuming that Mr. Lojek performed deficiently by not

counseling Petitioner to decline participation in the psychological examination, Petitioner

has not shown prejudice under a preliminary *Miller-El*-type review of the claim. Based on

the entire record–exclusive of the psychological report and any mention of it in other

parts of the record–reasonable jurists would not encourage Petitioner to pursue this claim.

For all of these reasons, Claim 3(4) is not substantial and does not qualify for the

*Martinez* exception.

**MEMORANDUM DECISION AND ORDER - 34**

### B.    *Failure to Object to Two Prison Guards Being on the Jury*

Claim 3(5) is that Mr. Lojek failed to object to inclusion of two prison guards on

the jury. The record reflects that, after a recess at trial and outside the presence of the

jury, Mr. Lojek addressed the issue with the court:

> Mr. Lojek:    Your Honor, the deputies are telling me that my client went
> out of the courtroom today and mentioned to them that he
> recognized two of the jurors as being former prison guards
> and guards that he knew from his time while in custody. And
> as I review the jury questionnaires, I did not see any evidence
> of any of them having worked for the prison or Department of
> Corrections previously. And, of course, they said they didn't
> know Mr. Hoak. So I don't know exactly what to do at this
> point, but I wanted to call it to the Court's attention and let
> you know that this has come up.

(State's Lodging A-3, p. 205.)

At that point, Mr. Haws recalled from voir dire that Juror 188, the male juror in

question, had worked for the Department of Correction in the past, but was now retired.

Mr. Haws and Judge Copsey indicated that Juror 188 did not say he recognized or knew

Petitioner when that question was asked of the jury pool. (*Id.*, pp. 205-06.) Judge Copsey

indicated that she had been watching the jurors carefully during trial and had not seen

Juror 188 look at Petitioner any differently or act as though he knew him. (*Id.*, p. 206.)

As to Juror 98, the female juror in question, Judge Copsey indicated that she had

just checked on Juror 98, and that the juror did not now work for the Department of

Correction, nor did she in the past. In addition, Juror 98's spouse did not work for the

Department of Correction. (*Id.*, pp. 206-07.)

**MEMORANDUM DECISION AND ORDER - 35**

Judge Copsey concluded, "I don't think there is any evidence at this point that either of these jurors are familiar with you or know anything about your background." (I*d*., p. 207.) She further indicated it was her experience that when jurors realize during trial that they know someone involved in the trial, they usually bring that to the attention of the court. (*Id.*) There is no indication in the state court record that either juror recognized Petitioner during the course of the trial, or that either juror engaged in any wrongdoing.

The facts in the record reflect only that Mr. Lojek did not strike Juror 188, a retired IDOC prison correctional officer. Nothing in the record indicates that this juror could have been stricken for cause, because Petitioner did not, during voir dire, recognize Juror 188 as someone Petitioner knew from his former prison term and Juror 188 did not say anything that would have caused his impartiality to be questioned. While Petitioner recognized Juror 188, the more important issue is that Juror 188 did not recognize Petitioner out of hundreds of inmates Juror 188 would have encountered in his job as a former correctional officer.

Most recently, Petitioner alleged: "I believe Dave Paskett had a lot to do with the two prison guards that ended up on my jury. Dave Paskett use[d] to be the warden at Max back when my ex-wife Sheila was a counselor at Max." (Dkt. 86, pp. 6-7.) Petitioner offers no evidence to support this speculative comment, and he does not provide any logical explanation for exactly how Mr. Paskett, a retired prison warden, could have caused the placement of these two individuals on the jury.

**MEMORANDUM DECISION AND ORDER - 36**

The law is clear that a criminal defendant has a fundamental right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To be impartial, the jury must be "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). Actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (citation and punctuation omitted). A biased juror deprives a defendant of his right to a fair trial. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). A juror may still be qualified to serve, however, even though he is not "totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 800 (1975). Rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

Here, Petitioner has not brought sufficient facts showing that Mr. Lojek should have stricken either of the jurors. Neither indicated that they knew Petitioner, and neither acted as if they knew him. There are no allegations that either juror knew of the facts or issues involved prior to trial. Petitioner does not allege that either indicated they would have any problem being unbiased in the trial, and there is no evidence before the Court of actual bias. When the objection to the two jurors was raised after voir dire, Judge Copsey made a reasonable inquiry into Petitioner's question, and the judge continued to monitor the demeanor of these jurors throughout the trial. Based on all of these factors, the Court concludes that Petitioner has come forward with nothing–other than the fact that one was

**MEMORANDUM DECISION AND ORDER - 37**

a retired correctional officer–that would show either juror was biased against him. As a result, Petitioner has failed to show that reasonable jurists would find debatable the Court's conclusion that, based on the record before it, there is not a reasonable possibility that Petitioner was prejudiced by the presence of these two jurors on the jury. The *Martinez* exception does not apply to cure the default of Claim 3(5).

## 2.   Application of *Maples v. Thomas*

Petitioner alleges that Theresa Martin, his initial post-conviction counsel, did nothing on his case. During their first meeting, Ms. Martin told him that he had no viable claims. He asked for her to be removed from his case. (State's Lodging C-18.) The state district court, Judge Copsey, held a hearing on Petitioner's pro se motion to disqualify Ms. Martin. (State's Lodgings C-15, C-18.) Petitioner stated that Ms. Martin refused to file a motion that Petitioner be released on his own recognizance pending the out come of the direct appeal, that she told him lying was not an adequate basis for a post-conviction claim, and that she knew nothing about his case. (*Id.*, pp. 2-3.) Afterward, Judge Copsey ordered Ms. Martin to complete the post-conviction case. Petitioner states that, although he was given four different telephone numbers to contact Ms. Martin, he was unable to do so. On May 3, 2010, Petitioner filed a motion requesting a telephonic hearing, notifying the Court that his attorney will not answer her phone or his letters. (State's Lodgings C-24.)

The record reflects that Ms. Martin asked for several extensions of time in which to file an amended petition, but never filed anything. (State's Lodgings C-19, C-23, C-

26.) After the state district court issued an order conditionally dismissing the petition

(State's Lodging C-28) and included an additional extension of time to file a motion to

amend the petition, Ms. Martin filed nothing. The original petition was later dismissed.

(State's Lodging C-29.)

Respondent argues that the record reflects disagreements between Petitioner and

Ms. Martin as to what constituted a valid claim. (See Dkt. 66, p. 44; State's Lodging C-

28, p. 2.) This disagreement is evident in Petitioner's pursuit of a pro se motion for

release on his own recognizance, that Ms. Martin apparently was unwilling to pursue

(with good reason, because it had no adequate factual basis). (*Id*.) However, that does not

excuse Ms. Martin's failure to notify the post-conviction court that, after requesting so

many extensions of time, she had decided not to file an amended petition and that

Petitioner would be proceeding on the original petition. Her failure to do so raises the

question of whether she was negligent in failing to file an amended petition.

Rather than calling for additional evidentiary submissions on that question, the

Court will assume, for the purpose of argument only, that Petitioner has shown that Ms.

Martin abandoned his case by failing to file an amended petition and failing to contest the

state district court's order conditionally dismissing the original petition. The Court will

also assume, without deciding, that *Maples* can be applied to instances where an original

pro se post-conviction relief petition was filed, and counsel was appointed to aid in

pursuit of that petition or to amend the petition. The Court now turns to the question of

whether Petitioner has shown prejudice for Claims 1, 2, and 4. As stated in *Stokley v.*

**MEMORANDUM DECISION AND ORDER - 39**

*Ryan*, a petitioner seeking to use the *Maples v. Thomas* exception "must establish 'not merely that the [alleged error] ... created a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage,' infecting the entire proceeding with constitutional error." 705 F.3d at 403.

## A.    *Discussion of Claim 1*

Claim 1 is that Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were allegedly violated because the prosecutor withheld favorable evidence and lied about having a tape recording of Petitioner's threats to the victim.[15] Particularly, Petitioner alleges:

> Ada County Prosecutor Gabriel Haws knew he had no tape recording of Larry M. Hoak telling Kathie Hendrick, "I'll cut your head off if I go to prison over your crap." He lied to the jury, misled them to believe he had a tape recording of this statement.

(Dkt. 36-1, p. 2.)

A review of the record reveals that Petitioner is simply incorrect in his belief. What was played at trial was an audiotape of Petitioner speaking to his cousin, "Don

---

[15] In his Petition, Petitioner also contends that Claim 1 is based on the prosecutor charging him with lewd conduct with a minor. (Dkt. 36, p. 2.) This statement appears to be from a minute entry from a September 20, 2007, pretrial conference in Petitioner's case, which is nothing more than a series of times and short phrases summarizing what was discussed–this seems to a discussion of the persistent violator charge (State's Lodging C-2, p. 193); however, that was not discussed by the sentencing court when discussing Petitioner's prior crimes. (State's Lodging A-3, pp. 636-43.) There is no factual basis whatsoever for this claim; rather, it appears to have been some sort of mistake in the record. The Amended Information Part II does not show lewd conduct as a past crime forming the basis of the persistent violator charge. (State's Lodging A-1, pp. 151-53.)

The Court construes this claim instead to be based on the factual allegations that Petitioner has included in the section he has labeled, "First Claim, Supporting Facts," in which he discusses the prosecutor's alleged withholding of favorable evidence.

**MEMORANDUM DECISION AND ORDER - 40**

Cada," "Don Cadotte," or "Donnie," in which Petitioner mentioned an incident in which he had *earlier* left a message on Kathy's answering machine that he would cut off her head, and that the message to Kathy had been left during a time period when Petitioner had been very ill. There was no audiotape played of the actual recorded message to Kathy. Rather, the audio CD that was played was a prison recording of Petitioner stating that he left that type of message on Kathy's answering machine; the audio CD had been redacted by stipulation of counsel before it was published to the jury.

Petitioner was confused in this same manner after trial, when he asked to have his counsel removed from representation of him for sentencing:

> The Court: I want you to concentrate on what [Mr. Lojek] did in his representation of you that you believe makes it necessary to disqualify him as we go into sentencing?

> Mr. Hoak: He didn't object one time to this cutting off her head – I mean, I was under the impression that there was a cassette tape all along because nobody would listen to me because when I got arrested, I had some problems, medical problems. Okay. I didn't know if I called her and said it or not. Okay, well, I didn't say it. All right. And it was – it was said over and over again in my trial and he didn't bust a move. He didn't say nothing. I mean –

> The Court: What would have been the basis for him to object?

> Mr. Hoak: To object?

> The Court: Because we call it an admission by the party when you have a tape recording of them saying things. Those are generally admissible.

> Mr. Hoak: Okay. That's what I'm saying. There wasn't a tape. If

**MEMORANDUM DECISION AND ORDER - 41**

there is, we didn't hear it at trial. Okay.

The Court:    But we did hear it at trial.

Mr. Hoak:     A tape?

The Court:    There was a CD recording. We did hear it. It was
              presented to the jury.

Mr. Hoak:     No, ma'am. You – not one of those – or the CDs said that I
              was going to cut her head off. Okay.

The Court:    Okay. Well, what – let's move on from that because, Mr.
              Hoak, the record –

Mr. Hoak:     The other thing is we left out –

The Court:    Wait, wait, wait just a second. I want to explain why. Mr.
              Hoak, the record speaks for itself. The transcripts and the
              exhibits themselves will demonstrate what happened or did
              not happen. Okay?

(State's Lodging A-3, pp. 579-81.)

In addition to the CD recording, two of Petitioner's letters mentioned a media

incident where a man had cut off a lady's head, presumably in a domestic dispute setting.

In closing argument, Mr. Haws referenced both the audio CD and the two letters:

> What does the defendant wish to accomplish by what he did?
> Clearly, clearly by the reference, the threat he made to Kathy on December
> 16th, 2005, by referencing that threat in two separate letters, of a beheading,
> and then admitting again later on to a friend that he did in fact threaten to
> cut her head off. What does it tell you about his intent when he writes the
> phrase, "I'm sorry that bastard cut his wife's head off. That's the story of
> our lives, you and me. An apology? That's what the defendant said. An
> apology? He was sorry? That's an intent to annoy and harass. That's an
> intent to make good on the prior threat that he made on December 16th,
> 2005. That is malicious.

**MEMORANDUM DECISION AND ORDER - 42**

(State's Lodging A-3, p 543.)

During his testimony at trial, Petitioner had an opportunity to tell the jury himself that, by including the references to another man cutting his wife's head off in the letters that he meant to say, "I'm not that person." (Dkt. 36-1, p. 12.) That is certainly one interpretation of the letters. However, the prosecution was not amiss in suggesting that the letters, together with the audio CD, suggested otherwise. The jury was admonished that the prosecutor's argument was merely argument, and that they should review the evidence themselves and come to their own conclusions. (State's Lodging A-3, p. 530.)

Petitioner further alleges that Mr. Haws admitted to altering a phone conversation between Petitioner and his cousin, Don Cadotte. (Dkt. 36-1, p. 2.) In fact, as noted above, Mr. Haws and Petitioner's counsel stipulated to redactions in the phone conversation CD.

This entire claim is without a factual basis, and, thus, Petitioner has shown no prejudice. In the alternative, because the claim should have been brought on direct appeal because the factual basis of the claim was known at that time, Petitioner was not prejudiced by post-conviction counsel's failure to raise it. *See Raudebaugh v. State*, 21 P.3d 924, 928 (Idaho 2001). Accordingly, *Maples* does not apply to save Claim 1 from being procedurally defaulted.

**MEMORANDUM DECISION AND ORDER - 43**

### B.    *Discussion of Claim 2*

Claim 2 is that the trial court violated Petitioner's Sixth Amendment right to call witnesses on his behalf and conspired with the prosecutor and appointed defense counsel. Petitioner first alleges that Judge Copsey knew Shannon Brownei, a paralegal/realtor and a State's witness, but Judge Copsey did not mention anything about their relationship at trial. Nothing about such a relationship appears in the record, and Petitioner brings forward no evidence to support such a conclusion.

Petitioner next claims that the judge, prosecutor, and defense counsel were engaged in a conspiracy. Petitioner alleges that "the bottom line is Gabriel Haws and Mike Lojek are protecting potential child molesters and their victim and everything else." (State's Lodging A-3, p. 579.) This argument is based on the fact that the court would not issue a subpoena for Kathy's mother to testify for Petitioner at trial.

As discussed at length above, when Petitioner complained to Judge Copsey about Mr. Lojek's strategy, he told Judge Copsey that Mr. Lojek refused to subpoena Kathy's mother as a witness. He believed she could testify that she knew Kathy's father had molested her during Kathy's childhood (some 40 years earlier) and yet she did nothing to stop the molestation. Also as noted above, Petitioner believed that Kathy's mother and other relatives were involved in a conspiracy to have him arrested after Petitioner confronted Kathy's mother about the 40-year-old incidents.

Petitioner has provided no evidence, either in the state court action or here, that Kathy's mother would have been a favorable, rather than an unfavorable, witness. As

Judge Copsey explained to Petitioner, he himself could testify of his interactions with Kathy's mother and provide evidence of the alleged conspiracy to have him arrested. However, as Judge Copsey also explained, the core of the stalking claim was Petitioner's own behavior, and, no matter how Kathy's mother's actions influenced Petitioner, he was still responsible for his own behavior. Kathy's mother's testimony would have had no bearing on Petitioner allegedly physically abusing Kathy, making verbal threats, sending letters, or making phone calls. Petitioner has produced no evidence that Judge Copsey's refusal to issue a subpoena to Kathy's mother to be a witness for Petitioner was the result of a conspiracy.

Also as evidence of the conspiracy, Petitioner alleges both that Mr. Haws withheld a piece of evidence, a letter from Bruce Hendricks, Kathy's ex-husband (Dkt. 36-1, p. 2), and that Petitioner's own counsel, Mr. Lojek, had a copy of the Bruce Hendricks letter (which means it was not withheld by the prosecution), and Mr. Lojek withheld it from Petitioner. (Dkt. 36-1, p. 5.)

Petitioner has not provided the Bruce Hendricks letter or given an inkling of what this letter contained, even though it was provided to his attorney. Kathy had been divorced from Bruce for 10 years at the time of trial. Because Petitioner has not shown that Bruce had any personal knowledge of whether Petitioner did or did not abuse Kathy, or whether Petitioner did or did not write the letters or make the telephone calls at issue, Petitioner has not shown that the Bruce Hendricks letter was relevant.

**MEMORANDUM DECISION AND ORDER - 45**

In disposing of the claim of conspiracy between the prosecutor and defense counsel (not involving the Court, as alleged here) on post-conviction review, the court reasoned:

> Although Hoak complains that certain witnesses lied at trial or that there was a conspiracy to "falsify" evidence, he produces nothing to substantiate his claims other than his own statements. Having carefully reviewed all of his material and the trial transcript, the Court cannot find anything among the various documents that suggest any witness lied or that falsified evidence was introduced. Furthermore, Hoak actually testified at trial and specifically challenged much of the victims' and others' testimony. Therefore, to the extent Hoak is suggesting the jury got it wrong, this is not subject to post-conviction relief; the jury's decision depends on the credibility of the testimony and that is not subject to post-conviction analysis.

(State's Lodging C-28, pp. 7-8.)

In his federal claim, Petitioner has added the trial court as a co-conspirator, but he has provided no facts to support such a claim. To the extent that he relies on the same evidence for either a two- or a three-member conspiracy, the claim was decided on the merits, and the "cause" for its procedural default is not the abandonment of post-conviction counsel but the failure of Petitioner to appeal the merits decision. To the extent that Petitioner is alleging a different conspiracy claim altogether, it fails to meet the *Maples* test for lack of any supporting facts, and, hence, lack of prejudice.

**MEMORANDUM DECISION AND ORDER - 46**

### C.   *Discussion of Claim 4*

Claim 4, liberally construed, is that Petitioner's sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment. Petitioner did not include this claim in his post-conviction petition, nor was any amendment filed. The sentencing court counted 10 felony convictions, at least 40 misdemeanor convictions, and 5 marriages that had ended based upon allegations of domestic violence (in each case, a no-contact order was issued in favor of the wife, and Petitioner violated the no-contact order). Included in his misdemeanor convictions was a prior stalking conviction. (State's Lodging A-3, pp. 642-43.)

Petitioner has failed to show that he was prejudiced as a result of post-conviction counsel failing to include it in an amended post-conviction petition. First, Petitioner challenged his sentence in a motion to reduce sentence, and any sentencing claim should have been raised on direct appeal, not in a post-conviction challenge. *See Roman v. State*, 873 P.2d 898 (Idaho Ct. App. 1994); Idaho Code § 19-4901(b) (prohibiting presentation in post-conviction relief proceedings of any issue that could have been raised on direct appeal). Therefore, his counsel did not err in failing to raise it on post-conviction review.

Second, Petitioner has presented no precedent to show that, even if the claim would have been raised (perhaps as the basis for an ineffective assistance of direct appeal counsel), he has a reasonable possibility of prevailing on the claim. No United States Supreme Court precedent exists to support Petitioner's argument that he received a constitutionally excessive sentence for the offense of stalking. *See Rummel v. Estelle*, 445

**MEMORANDUM DECISION AND ORDER - 47**

U.S. 263, 274 n.11 (1980) (A sentence of life with the possibility of parole was not

unconstitutional under a recidivism statue where the underlying offenses were fraudulent

use of a credit card to obtain $80 in goods and services, passing a forged check for

$28.36, and obtaining $120.75 by false pretenses; the Court cited an example of a

disproportionate sentence as "if a legislature made overtime parking a felony punishable

by life imprisonment."); *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) (the Court

affirmed a Michigan court judgment sentencing the defendant to a statutory mandatory

life sentence without the possibility of parole for possessing more than 650 grams of

cocaine; only a "gross disproportionality principle" can be extrapolated from among the

majority and concurring justices' opinions in this case); *Lockyer v. Andrade*, 538 U.S. 63

(2003) (two consecutive sentences of 25 years to life in prison for a "third strike"

provision of state law for stealing $150 worth of videotapes did not violate the gross

disproportionality principle and did not warrant habeas corpus relief); *Ewing v.

California*, 538 U.S. 11 (2003) (same result for inmate convicted of felony grand theft for

stealing three golf clubs, worth $399 apiece.)

Because the state criminal persistent violator statute, Idaho Code § 19-2514, under

which Petitioner was convicted permits a sentence of up to life imprisonment[16] and

---

[16] *See* Idaho Code § 19-2514 ("Any person convicted for the third time of the commission of a
felony, whether the previous convictions were had within the state of Idaho or were had outside the state
of Idaho, shall be considered a persistent violator of law, and on such third conviction shall be sentenced
to a term in the custody of the state board of correction which term shall be for not less than five (5) years
and said term may extend to life."). The stalking charge, alone, would not have resulted in so lengthy a
sentence, but, based on Petitioner's egregious criminal history, the Judge noted, "Enough is enough."
(State's Lodging A-2, p. 287.) *See* Idaho Code § 18-7905 ("Stalking in the first degree is a felony
punishable by a fine not exceeding ten thousand dollars ($10,000) or imprisonment in the state prison for

**MEMORANDUM DECISION AND ORDER - 48**

Petitioner's recent conviction and sentence was for a far more serious crime than those the United States Supreme Court has addressed, Petitioner cannot show that his Eighth Amendment claim would have been successful in any forum. Thus, he would not have been able to meet the high standard to be granted relief by the Idaho appellate courts on federal constitutional grounds, and, hence, there is no prejudice. *Maples* does not apply to save this claim from being procedurally defaulted.

3. **Even Assuming Cause Exists for the Default of Claim 3, Prejudice Has Not Been Shown**

*Maples* applies only to claims that were procedurally defaulted *as a result of* PCR counsel abandoning the petitioner. *See* 132 S.Ct. at 927. Petitioner's IATC claims set forth in Claim 3(1), (2), and (3) *were* heard on the merits at the state district court level, and then procedurally defaulted *for failure to raise them in the state appellate courts*. Therefore, *Maples* cannot be applied, because post-conviction counsel did not cause the default of these claims. However, even assuming that Petitioner could show "cause" for the default of these claims in another manner, Petitioner has not shown prejudice.

A. *Failure to Call Witnesses*

Petitioner alleges that Mr. Lojek failed to call witnesses of Petitioner's choosing at trial. On post-conviction review, the court concluded:

> The essence of nearly all of Hoak's allegations involve his counsel's strategic and tactical decisions. Hoak presented no facts which would give rise to a genuine issue as to whether his trial counsel's conduct fell "outside

---

not less than one (1) year nor more than five (5) years, or by both such fine and imprisonment").

**MEMORANDUM DECISION AND ORDER - 49**

the wide range of professional norms." Conclusory allegations, unsupported
by specific facts, do not raise a genuine issue of material fact and will not
preclude summary dismissal. In addition, to the extent that he is alleging his
counsel should have presented other witnesses, cross-examined different or
evidence at trial, Hoak failed to provide any indication of what his trial
counsel should have done different.

(State's Lodging C-29, pp. 9-10, citations omitted).

Not only does he fail to support any of his conclusory allegations
with facts, but strategic and tactical decisions will not be second guessed or
serve as a basis for post-conviction relief under a claim of ineffective
assistance of counsel, unless the decision is shown to have resulted from
inadequate preparation, ignorance of the relevant law, or other
shortcomings capable of objective review. Therefore, the Court dismisses
this claim.

(State's Lodging C-29, pp. 9-10.)

The Court has scoured the state court record and found mention of three witnesses
that Petitioner believes should have been called in defense at trial. As discussed above,
Petitioner's allegation that Mr. Lojek should have subpoenaed Kathy's mother to testify is
meritless.

In the original post-conviction petition, Petitioner argued that Kathy lied when she
testified that a gentlemen they dealt with at the bank noticed how stressed she looked
when Petitioner and Kathy went to the bank to get some money. Petitioner argued that his
trial counsel should have called Judy Hall, "the president of the bank," whom Petitioner
describes as a "nice lady" who waited on them when Petitioner asked Kathy to co-sign for
overdraft protection, as a rebuttal witness, to show that Kathy was lying. Petitioner states
that Judy has transferred to a different bank by the time he had filed his post-conviction

**MEMORANDUM DECISION AND ORDER - 50**

action, but that he could try to find her. (Dkt. 36-1, p. 9; State's Lodging C-2.)

It is evident from the trial transcript that Petitioner and Kathy went to the bank together several different times so that Kathy could provide financial help to Petitioner, including as a cosignor for overdraft protection on his checking account and for a line of credit on Kathy's house. (State's Lodging A-3, pp. 165-66, 262-63, 451.) Petitioner has not provided any evidence that Judy Hall had any personal knowledge to testify that Petitioner and Kathy never met with a male bank employee during one of their bank transactions. That Petitioner and Kathy had been cordial to one another in front of Judy Hall at some point in time has no bearing on whether Kathy looked stressed during a completely different bank transaction. Because Petitioner did not contact Judy Hall, he does not know whether–even if she remembered a particular transaction with Petitioner and Kathy–her testimony would have been favorable or unfavorable. In addition, such a rebuttal witness placed in the balance opposite the letters, phone calls, and other witnesses with more relevant testimony would not create a reasonable probability that the outcome of the trial would have been different. Therefore, Petitioner has failed to bring forward sufficient facts demonstrating that his trial counsel performed deficiently when he failed to call Judy Hall as a witness or that Petitioner's case was prejudiced thereby.

Petitioner also stated in his original post-conviction petition that Kathy had lied when she testified at trial that Petitioner would not leave her side during an emergency room visit when Petitioner was asked to leave by the attending physician. This was the incident in which Kathy went to the emergency room with breathing difficulties after

**MEMORANDUM DECISION AND ORDER - 51**

Petitioner allegedly had beaten her in the chest. At the emergency room, Kathy told

medical personnel that an attic ladder had come down and hit her in the chest. Petitioner

now states that the doctor never asked him to leave Kathy's bedside, and he wanted his

attorney to contact the doctor who treated Kathy.

Petitioner has failed to produce any evidence showing the identity of the doctor, or

that the doctor had a memory of this incident. Importantly, Petitioner has not shown

whether the doctor, if called as a witness, would have testified favorably or unfavorably.

Had Petitioner called this witness, the prosecution might have been able to elicit

testimony from the doctor that it is a common phenomenon for victims of domestic abuse

to lie about how they received their injuries in order to protect their male companions.

The doctor may have also been asked whether, in his opinion, it was likely that the injury

occurred as a result of an attic ladder or domestic violence. The potential for unfavorable

testimony was far more likely than the potential for favorable testimony. Thus, Petitioner

cannot show that his defense was prejudiced by the omission.

Accordingly, the Court concludes that Petitioner has failed to show that any

prejudice resulted from the failure of Mr. Lojek to call any of these witnesses, thus failing

to meet the "prejudice" prong of *Coleman*.

### B. *Failure to Object to Lies Kathy Hendricks Told Under Oath and Failure to Cross-Examine Witnesses*

In Petitioner's post-conviction petition, he goes through the trial transcript line by

line and takes issue with what Kathy said at trial. Many of the alleged discrepancies are

**MEMORANDUM DECISION AND ORDER - 52**

merely his perceptions–that is, slightly ambiguous testimony could be perceived as either consistent or inconsistent with other evidence. (See State's Lodging C-2, pp. 2-9.) Other discrepancies simply are irrelevant. No witness at trial is expected to have a perfect memory; a good lawyer will cross-examine only on those points that actually are at issue in the trial. Especially in cases where the victim is alleging abuse, a defense attorney must take care that the jury does not perceive him as badgering the alleged victim; too much cross-examination on minutiae can backfire and cause the jury to become sympathetic to the victim.

For example, Petitioner states that he told Mr. Lojek that Kathy sent him a card *and* a $25 money order, but he did not cross-examine her on Kathy's failure to mention the $25. However, Mr. Lojek first focused on the issue that Kathy had *initiated* the contact:

> Mr. Lojek:    At that time what contact, if any, did you initiate between yourself and the defendant?
>
> Kathy:    The only thing I sent about a week after he was arrested was a card.

(State's Lodging A-3, pp. 192-93.)

Later, the cross-examination included the following:

> Mr. Lojek:    Did you in fact go to the jail and provide money for Larry's use?
>
> Kathy:    When he was first arrested back in January of 2005, yes, I did.
>
> Mr. Lojek:    January of '05?
>
> Kathy:    January of '05. Never last year. Never.

**MEMORANDUM DECISION AND ORDER - 53**

Mr. Lojek:      Never in 2006?

Kathy:          No.

Accordingly, Mr. Lojek *did* cross-examine Kathy on the issue of whether she had

provided money to Petitioner in January 2006, though not precisely about whether it was

sent by card or delivered in person. That distinction does not support an ineffective

assistance claim. In any event, Petitioner does not bring forward any evidence showing

that Kathy provided him with money in January 2005 *and* January 2006.

Petitioner's other related claim is that Mr. Lojek failed to cross-examine some of

the State's witnesses. In dismissing this claim, Judge Copsey noted that Petitioner failed

to identify what his trial counsel should have done on cross-examination." (State's

Lodging C-29, p. 8.) This Court agrees. Simply pointing out that Mr. Lojek declined the

opportunity for cross-examination does not mean that his performance was deficient, or

that prejudice likely resulted. As noted above, Mr. Lojek did not cross-examine Gavin

Kowallis (a bailbondsman) or Shannon Brownei (a friend and realtor of Kathy). Petitioner

gives no inkling of what favorable testimony could have been elicited from Mr. Kowallis

had cross-examination been undertaken.

Petitioner urges that counsel should have cross-examined Shannon Brownei to

pursue the issue that Shannon allegedly had agreed to take over payments on his truck for

her son, but then stopped making the payments. The truck payments were mentioned by

Shannon as one of the reasons Petitioner called her, and could have been the subject of

cross-examination to call into question Shannon's credibility. Even if Mr. Lojek was

**MEMORANDUM DECISION AND ORDER - 54**

deficient for failing to cross-examine Shannon in this matter, Petitioner has not shown a

reasonable probability that the outcome of the trial would have been different, given that

Petitioner made that point in his testimony and that the other evidence of Petitioner's acts

supporting the stalking charge was overwhelming. Thus, this claim is not substantial.

In dismissing the post-conviction claims that Mr. Lojek failed to cross-examine

witnesses about lies or at all, Judge Copsey wrote:

> Although Hoak complains that certain witnesses lied at trial or that
> there was a conspiracy to "falsify" evidence, he produces nothing to
> substantiate his claims other than his own statements. Having carefully
> reviewed all his material and the trial transcript, the Court cannot find
> anything among the various documents that suggest any witness lied or that
> falsified evidence was introduced. Furthermore, Hoak actually testified and
> specifically challenged much of the victim's and others' testimony.
> Therefore, to the extent Hoak is suggesting the jury got it wrong, this is not
> subject to post-conviction relief; the jury's decision depends on the
> credibility of the testimony and that is not subject to post-conviction
> analysis.

(State's Lodging C-29, pp. 7-8.)

The record reflects that Petitioner had opportunity to cover most of the points in

his own testimony, a sound defense strategy which avoids the situation where an adverse

witness who is being cross-examined might say something even more harmful to the

defendant's case than the original testimony given. Petitioner's counsel cross-examined

Kathy carefully and adequately, attempting to show when and why Kathy contacted

Petitioner or when she welcomed contact with Petitioner. As to the other witnesses,

Petitioner has failed to show that their testimony on cross-examination went to an element

of the crime, or that their testimony was so critical that more cross-examination on

**MEMORANDUM DECISION AND ORDER - 55**

credibility was warranted.

The Court concludes that Petitioner has failed to show that he suffered any prejudice as a result of Mr. Lojek failing to object to witness testimony or cross-examine them any further than he did. *Coleman* does not apply to excuse Petitioner's procedural default of these claims.

**4.      Actual Innocence to Excuse Procedural Default**

The Court previously rejected Petitioner's actual innocence claim because Petitioner's claim did not rely on new evidence not presented to the jury. *See House v. Bell*, 547 U.S. 518, 538-39 (2006). (Dkt. 62, p. 9.) The Court concluded: "Petitioner has not offered that type of evidence, instead relying primarily on his personal opinion about the veracity of the trial witnesses and the reliability of the evidence that was presented." (Dkt. 62, p. 9.) Petitioner again makes the same type of allegations about Kathy Hendricks lying under oath, which the Court already rejected. He also argues that the prosecutor used false evidence to charge him with lewd conduct with a minor, which is not supported by the state court record. (Dkt. 74, p. 1.) Petitioner's actual innocence claim is rejected for failure to rely on new evidence not presented to the jury. In addition, the Court notes that there is nothing of substance in the entire record that raises a question that Petitioner may be actually innocent of the stalking or persistent violator convictions.

**5.      Conclusion**

As a result of the foregoing, Respondent's Motion for Summary Judgment (Dkt. 52) will be granted, and Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt.

**MEMORANDUM DECISION AND ORDER - 56**

36) will be dismissed with prejudice. Petitioner's Motion to Proceed with Habeas Petition (Dkt. 65) will be denied.

## ORDER

**IT IS ORDERED:**

1.  Respondent's Motion for Summary Judgment (Dkt. 52) is GRANTED.

2.  Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 36), and this entire action, are DISMISSED with prejudice.

3.  Petitioner's Motion to Proceed with Habeas Petition (Dkt. 65) is DENIED.

4.  Petitioner's Motion re: Amended Complaint and Appointment of Counsel (Dkt. 66) is DENIED.

5.  Petitioner's Motion: Civil Procedure 10(c) (Dkt. 71) is DENIED.

6.  Petitioner's Motion: Civil Procedure 10(c) - Jury Trial Demand (Dkt. 72) is DENIED.

7.  Petitioner's Motion to Recuse (Dkt. 74) is DENIED.

8.  Petitioner's Rule 10 Motion to Attach New Evidence (Dkt. 81) is GRANTED to the extent that the Court has considered Petitioner's exhibits in the context of cause and prejudice and actual innocence to determine whether Petitioner's procedural default can be excused.

9.  Petitioner's Motion Under Rule 60(b) (Dkt. 84) and his Motion: Response to Docket 85 (Dkt. 86) are DENIED.

10. Respondent's Motion for Extension of Time (Dkt. 70) is GRANTED.

**MEMORANDUM DECISION AND ORDER - 57**

11.   The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner

files a timely notice of appeal, the Clerk of Court shall forward a copy of

the notice of appeal, together with this Order, to the United States Court of

Appeals for the Ninth Circuit. Petitioner may seek a certificate of

appealability from the Ninth Circuit by filing a request in that court.

DATED:  **September 25, 2013**

Honorable Edward J. Lodge
U. S. District Judge